**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA, for the
use and benefit of PCC
Construction Components,
Incorporated; PCC CONSTRUCTION
COMPONENTS, INCORPORATED,
Plaintiffs,

v.

HARVEY HARRIS CONTRACTORS,
INCORPORATED; JAMES W. ANCEL,
INCORPORATED, HARTFORD ACCIDENT                    No. 96-1042
AND INDEMNITY COMPANY;
HARRIS/ANCEL JOINT VENTURE II,
Defendants-Appellees,

v.

CEARFOSS BROTHERS CONSTRUCTION
COMPANY, INCORPORATED, a/k/a
Cearfoss Brothers Company,
Incorporated,
Third Party Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-95-123-A)

Argued: June 3, 1997

Decided: July 23, 1997

Before RUSSELL, MURNAGHAN, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Anthony Klimek, Jr., KLIMEK, KOLODNEY & CASALE, P.C., Washington, D.C., for Appellant. Roger Cavenaugh Jones, HUDDLE & JONES, P.C., Columbia, Maryland, for Appellees. **ON BRIEF:** Karen Chalmers Coe, KLIMEK, KOLODNEY & CASALE, P.C., Washington, D.C., for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Harris/Ancel Joint Venture II (Harris/Ancel) obtained a contract with the National Park Service for the rehabilitation of a maintenance yard near National Airport. After being awarded the contract, Harris/Ancel subcontracted with Cearfoss Brothers Construction Company, Inc. (Cearfoss) to supply and to erect seven preengineered buildings and one preengineered building owned by the National Park Service. The subcontract provided for progress payments. Payment by the National Service to Harris/Ancel was a condition precedent to Harris/Ancel's obligation to pay Cearfoss.

After completing some of the work, Cearfoss requested payment from Harris/Ancel. Harris/Ancel refused to pay Cearfoss stating that Cearfoss had failed to comply with the contractual conditions for payment. Thereafter, Cearfoss walked off the job, and Harris/Ancel terminated Cearfoss' subcontract for default. Subsequently, Cearfoss sued Harris/Ancel for damages. The district court concluded that Cearfoss had failed to comply with the terms of the contract and entered judgment in Harris/Ancel's favor.

2

I.

FACTS AND PROCEDURAL HISTORY

The National Park Service awarded a contract to Harris/Ancel Joint Venture II[1] (Harris/Ancel) for the construction of the George Washington Memorial Parkway Maintenance Center (hereinafter "the Project"). The Project required the installation of seven prefabricated metal buildings, which the Prime Contract specified were manufactured by Star Building Systems (Star).

On October 11, 1993, Harris/Ancel entered into a further subcontract with Cearfoss Brothers Construction Company, Inc. (Cearfoss), a local distributor for Star.[2] Cearfoss' subcontract was for a fixed amount of $676,000.00. Article 5 of the subcontract provided:

> 5. PRICE AND PAYMENT
>
> The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to the Subcontractor for payment of work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor ...*** The Contractor is entitled to proof of payment for labor, material and services used before payment is due *** The Subcontractor shall itemize the Subcontract price as a basis for establishing value of work complete, and partial payments. Subcontractor agrees that it will not be paid by the Contractor for work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner. If the Contractor withholds making payment to the Subcontractor until the Subcontractor has complied with the aforesaid terms and conditions, the Subcontractor shall still diligently proceed with the work as required.

_____

[1] James W. Ancel, Inc. entered into a partnership with Harvey Harris Contractors, Inc. to form the joint venture.

[2] In turn, Cearfoss subcontracted the majority of its work to material suppliers, Star, and labor subcontractors, such as PCC Construction Components, Inc. (PCC), a plaintiff in the action below.

3

On March 28, 1994, by letter addressed to Star, Harris/Ancel, Cearfoss, and Star entered into a "Joint Check Agreement" whereby the parties agreed that Harris/Ancel would issue a joint check payable to Cearfoss and Star. The letter directed Star to provide invoices for work and materials on or about the 25th of each month. The invoices were to be provided concurrently by Star to both Harris/Ancel and Cearfoss.

On August 29, 1994, Cearfoss submitted an Application and Certificate for Payment. Harris/Ancel returned the Application unpaid to Cearfoss stating that Cearfoss' Application was submitted too late to receive payment, and additionally, Cearfoss had failed to provide "any back-up for the monies invoiced." On September 23, 1994, Cearfoss resubmitted its Application and Certificate for Payment in the amount of $422,244.00. On October 14, 1994, Harris/Ancel informed Cearfoss that it would not pay the invoice and listed the following reasons: (1) Cearfoss had failed to provide a certified payroll of its workers; (2) Cearfoss had failed to provide a certificate of insurance as required by Article 36[3] of the subcontract; (3) the exterior wall panels had not been installed; (4) Cearfoss' refusal to clean oil spills created by it; (5) Harris/Ancel's purchase of materials and provision of "front monies" to enable the project to proceed; (6) the presence of deteriorated materials; (7) Cearfoss' failure to provide additional manpower on site; and (8) Cearfoss' failure to provide an on-site superintendent. As a result in its October 17, 1994, requisition to National Park Service (the Owner), Harris/Ancel did not include any sums for the account of Cearfoss. On October 19, 1994, Harris/Ancel acknowledged receipt of Cearfoss' certified payroll report, but its position on payment to Cearfoss remained unchanged.

On October 20, 1994, Cearfoss advised Harris/Ancel that unless Cearfoss received payment of the $422,244.00 immediately, Cearfoss

_____

[3] Article 36 provides:

> This subcontract must be executed by the Subcontractor and returned to the Contractor within fifteen (15) days of its receipt by the Subcontractor. Until the subcontract is executed and returned to the Contractor, along with any required bonds and Certificates of Insurance, the Contractor has a right to withhold any payment due the Subcontractor.

4

would cease all work on the Project effective the next day.[4] By letter, dated October 21, 1994, Harris/Ancel took strong exception to Cearfoss' threat to cease work on the Project, and advised Cearfoss that any such stoppage would be considered a breach of the contract, and Harris/Ancel would proceed to terminate the subcontract for default. True to its word, on October 21, 1994, Cearfoss ceased work on the Project.

Thereafter, on October 27, 1994, in accordance with Article 13[5] of the subcontract, Harris/Ancel advised Cearfoss that its subcontract would be terminated for default after the close of business on November 1, 1994. Cearfoss did not return to the Project to cure its alleged

_____

[4] Cearfoss also reported that PCC, its subcontractor, refused to deliver any more materials or to provide any further work.

[5] Article 13 provides:

> The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: failure to expeditiously prosecute and complete the whole or any part of the work in accordance with the current Schedule of Progress and/or directions from the Contractor; failure to pay for labor and material, payroll taxes, contributions or insurance premiums; interference with the performance of work by others for any reason; ... or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. *** Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach without waiver of any rights or remedies available to the Contractor, including the right to setoff and collection of any funds which may be due Subcontractor under other subcontracts with Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 28, Termination for Convenience.

5

default. Accordingly, on November 2, 1994, Harris/Ancel terminated Cearfoss' subcontract for default.**6**

On January 25, 1995, PCC filed a claim against Harvey Harris Contractors, Inc.; James W. Ancel, Inc. and Hartford Accident and Indemnity Company in the United States District Court for the Eastern District of Virginia, pursuant to the Miller Act, 41 U.S.C. § 270a and 270b, et seq. Subsequently, Harris/Ancel filed a counterclaim against PCC and PCC filed a third-party complaint against Cearfoss. On April 14, 1995, Cearfoss filed a crossclaim against Harris/Ancel. On May 8, 1995, Harris/Ancel answered the crossclaim and filed a counter crossclaim against Cearfoss. Also on May 8, 1995, the district court entered an order (1) dismissing with prejudice PCC's action against Harris/Ancel, (2) dismissing with prejudice Harris/Ancel's counterclaim against PCC, and (3) dismissing with prejudice PCC's action against Cearfoss. The result of these procedural mechanisms was that only Harris/Ancel's counterclaim against Cearfoss and Cearfoss's crossclaim against Harris/Ancel remained. Therefore, the district court treated Cearfoss as the plaintiff and Harris/Ancel as the defendant.

On September 19, 1995, in a ruling from the bench, the district court found that Cearfoss breached its subcontract and was not entitled to any damages. After reviewing Harris/Ancel's claim for damages, the district court awarded Harris/Ancel damages in the amount of $31,702.37. On September 29, 1995, Cearfoss filed a Motion for Amendment of Findings and Judgment. On November 29, 1995, the district court denied the motion. The district court ordered Cearfoss to pay Harris/Ancel's attorneys' fees in the amount of $22,802.22. On December 29, 1995, Cearfoss lodged its appeal with this court.

II.

DISCUSSION

Essentially, the instant dispute arises from Article 5 of the subcontract. Harris/Ancel claims that it was entitled to withhold payment to

_____

**6** Subsequent to Cearfoss' contract termination, Harris/Ancel paid in full each and every subcontractor of Cearfoss.

6

Cearfoss because Cearfoss did not comply with the terms of the sub-contract. Specifically, Harris/Ancel contends that Cearfoss failed to submit the proper documentation to support its request for payment. In contrast, Cearfoss argues that the condition precedent to progress payments to Cearfoss was extinguished by virtue of Harris/Ancel's failure to request payment for Cearfoss' services from the National Park Service.

We review the district court's findings of fact for clear error and its legal conclusions, de novo. See Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455 (4th Cir. 1996).[7]

A.

The district court found that Harris/Ancel was excused from applying to the National Park Service for payment for Cearfoss' services

_____

[7] Harris/Ancel also challenges the court's jurisdiction over this appeal. Harris/Ancel previously filed a motion to dismiss the appeal on the grounds that Cearfoss' Notice of Appeal stated that it appealed from the district court's order denying its Motion for Amendment of Findings and Judgment, which is not a "final decision" subject to appeal. A panel of this court denied the motion.

While it is true that the Notice of Appeal does state as Harris/Ancel has indicated, it is quite obvious that Cearfoss' counsel made a mistake. More importantly, Harris/Ancel has not demonstrated that it is in any way prejudiced by Cearfoss' counsel's inadvertence. In fact, in its reply to Cearfoss' opposition to its Motion to Dismiss, the only prejudice identified by Harris/Ancel was its assertion that it would suffer prejudice by being required to brief a case for which the court did not have jurisdiction. In fact, the court does have jurisdiction, so Harris/Ancel's prejudice disappears.

Finally, Rule 3(C) of the Appellate Procedure is laced with language suggesting flexibility. See also Gadson v. Chater, 60 F.3d 821 (4th Cir. 1995) (Table) ("Technical precision is not required in a notice of appeal provided the filing functions to notify the court and the opposing party of an intent to appeal a judgment."). Harris/Ancel would be hard pressed to argue that Cearfoss' Notice of Appeal did not adequately convey Cearfoss' intent to appeal the judgment entered by the district court on September 19, 1995.

because "given the nature of a Miller Act case, that is where the contractor is dealing with the Federal Government, it's well within a contractor's right and, in fact, obligation to ensure that improperly or inadequately documented bills are not being submitted to the Federal Government." While the district court found that certificates of insurance were required by the subcontract, and that Cearfoss had not submitted the required certificates, the district court stated that "the far more telling one in my mind is the failure to provide invoices. I find that the simple itemization of labor and materials supplied by the plaintiff was not sufficient, and itemization is not an invoice." Therefore, the district court concluded that Cearfoss breached the subcontract by not providing Harris/Ancel with invoices to support its payment for services rendered and materials used.

As for the Cearfoss' walking off the job, the district court also concluded the Cearfoss breached the subcontract by ceasing work on the Project. The district court noted that under the plain language of Article 5, a subcontractor is required diligently to proceed with work on the Project, even if a pay dispute exists between the subcontractor and the contractor. Cearfoss did not do so, and hence, breached the subcontract. With respect to that breach, the district court found that Harris/Ancel acted appropriately in terminating the subcontract. Thus, the district court found that due to its breach, Cearfoss was not entitled to any damages.

Cearfoss attacks the district court's reasoning on a number of grounds. First, Cearfoss claims that the documentation submitted by it to Harris/Ancel was sufficient to qualify as"proof of payment" as required by the subcontract. Second, Cearfoss maintains that the Joint Check Agreement modified Article 5 of the subcontract. As a result of this modification, Cearfoss contends, Harris/Ancel assumed responsibility for payment to Star, and thus, Cearfoss could not provide proof of its payment to Star. Third, assuming the documentation was insufficient, Cearfoss maintains that Harris/Ancel did not timely notify Cearfoss that its documentation was defective.

B.

The controversy stems over invoices. Cearfoss claims it complied with Article 5, while Harris/Ancel maintains the Cearfoss did not. No

8

doubt exists that Cearfoss did not submit invoices from Star with its requests for payment. Cearfoss did, however, submit an itemization of its labor and materials with its request. The district court, as recounted above, found that the itemization submitted by Cearfoss was inadequate under the terms of Article 5. This finding cannot be said to be clearly erroneous.

A review of Cearfoss' Applications for Payments demonstrates that those requests do not contain any level of specificity, but rather recount general sums in categories. While after submission of its first Application, and Harris/Ancel's rejection of that Application for failure to provide invoices, Cearfoss submitted another Application which included work done per building, the Application still did not include any breakdown of hours, time involved, materials used, or other such customary items.

In fact, in its September 15, 1994, letter to Cearfoss, Harris/Ancel stated that the Application was being rejected because back-up documentation for monies invoiced was not provided. Examples of the required specificity, Harris/Ancel noted were "cost per building, labor and material for structural steel, wall panels, roof panels, etc." Cearfoss' Application did not include such a breakdown. Thus, the district court's finding the Cearfoss' request for payment did not include the proper "proof of payment" documentation is not clearly erroneous.[8]

_____

[8] Cearfoss also makes another related argument. Cearfoss argues that even if its Applications suffered from the lack of back-up documentation, Harris/Ancel was required to submit Cearfoss' application for payment to the National Park Service, and was not excused from doing so. Cearfoss' argument is based on the prevention doctrine, which provides that "one who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition." Thus, Cearfoss argues that since Harris/Ancel failed to submit Cearfoss' Application for payment, Cearfoss was excused from complying with the invoice requirement. As the district court found Harris/Ancel is entitled as the Contractor to exercise its discretion in determining whether a payment application is properly submitted. Moreover, Harris/Ancel presented testimony at trial that the government would not accept Cearfoss' Application without the accompanying back-up invoices. Thus, the district court's finding that Harris/Ancel was excused

9

C.

Alternatively, Cearfoss argues that it was not required to submit invoices for materials from Star because the Joint Check Agreement modified Article 5.**9** Cearfoss claims that the Joint Check Agreement required Star to submit invoices directly to Harris/Ancel, and then Harris/Ancel would cut a joint check to both Cearfoss and Star. Hence, Cearfoss argues that it was relieved of its obligation to submit material invoices because the Joint Check Agreement mandated Star to deal directly with Harris/Ancel. Cearfoss contends that "[i]n light of the Joint Check Agreement it was impossible for Cearfoss to provide proof of payment for Star, since [Harris/Ancel], not Cearfoss, would be paying for materials by issuing a joint check to Star and Cearfoss." Appellant's Brief, at 15.

First, the Joint Check Agreement makes no mention of modifying Article 5 of the subcontract. Second, the Joint Check Agreement explicitly requires Star to submit invoices to both Harris/Ancel and Cearfoss. Thus, Cearfoss' argument that it could not provide invoices to Harris/Ancel is contradicted by the very language of the Joint

_____

from submitting Cearfoss' incomplete application for payment is not clearly erroneous.

As an aside, Cearfoss' argument suffers from another flaw in that before Harris/Ancel is required to apply for payment from the National Park Service, Cearfoss must submit the invoices, thus Cearfoss' submission of the invoices is a condition precedent to Harris/Ancel's submission for payment.

Finally, as for Cearfoss' argument that Harris/Ancel did not provide them with timely notice of the deficiencies with its invoices, that argument too must fail. The record bears out through testimony at trial, and the written correspondence, that Harris/Ancel timely notified Cearfoss of the problems with its invoices. Indeed on direct examination, David Cearfoss stated that he told his brother, Gary, to make sure all the proper paper-work was submitted to Harris/Ancel, after David Cearfoss' conversation with Harris/Ancel.

**9** Cearfoss has correctly noted that the district court did not address this issue.

10

Check Agreement upon which it seeks to rely.**10** Third, Cearfoss included within its application for payment, work performed and materials supplied by Star. While Harris/Ancel ultimately would pay Star by way of a joint check issued to Cearfoss and Star, Harris/Ancel would still be required to have invoices of Star's work to submit with Harris/Ancel's requisition to the National Park Service. As Cearfoss never submitted those invoices, its application was incomplete, and Harris/Ancel had no duty to request payment for Cearfoss' services.**11**

D.

Finally, Cearfoss claims that it walked off the job because it was not being paid. Even assuming the validity of Cearfoss' dispute with Harris/Ancel, which is not valid as a result of Cearfoss' failure to provide invoices, the subcontract plainly and unequivocally provides that even in the event of a pay dispute, the subcontractor shall "diligently proceed with the work required." As the district court correctly found, Cearfoss' walking off the job before completion of the Project breached the subcontract.**12** As such, Cearfoss was not entitled to any damages.**13**

_____

**10** During the trial, Star's invoices were produced. Harris/Ancel claims that an examination of those invoices reveals that Cearfoss was engaged in overbilling. Of course, Cearfoss denies that it engaged in any overbilling practices. The district court did not address this issue as its resolution was not required, and neither do we.

**11** Cearfoss notes in its reply that Harris/Ancel never asked for the Star invoices when it returned Cearfoss' Application for Payment. A review of the letters sent by Harris/Ancel does in fact support Cearfoss' position. Harris/Ancel never specifically requested the invoices from Star as part of the necessary documentation needed to complete Cearfoss' Application. Despite Harris/Ancel's failure specifically to request the Star invoices, Cearfoss still cannot prevail, as the district court's finding that Cearfoss' invoices, apart from the lack of the Star invoices, were insufficient is not clearly erroneous.

**12** The district court's finding that Harris/Ancel properly exercised its option under the contract to terminate Cearfoss' subcontract is also not clearly erroneous. Harris/Ancel properly provided Cearfoss with an opportunity to cure its default and provided Cearfoss with three business days as required under the contract.

**13** Harris/Ancel also spends the last portion of its brief arguing that Cearfoss is not entitled to damages consisting of lost anticipated profits. The district court also did not address this point, and we need not either. As Cearfoss breached the subcontract by walking off the job, Cearfoss is not entitled to damages.

11

III.

CONCLUSION

In sum, the district court's finding that Cearfoss breached the sub-contract by failing to provide invoices with its requests for payment is not clearly erroneous. Accordingly, the district court is

<u>AFFIRMED</u>.

12